■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HOWARD ROSE-MAN, Appellant. — Appeal by defendant from a judgment of the Supreme Court, New York County, rendered January 10, 1979, convicting him of four counts of criminal contempt in the first degree, upon a jury verdict, and imposing sentence. (The appeal was transferred to this court by order of the Appellate Division, First Department, dated Feb. 21, 1980.) Judgment affirmed. This case is remitted to the Supreme Court, New York County, for further proceedings pursuant to CPL 460.50 (subd 5). On November 9, 1977 defendant testified, pursuant to a subpoena, before a New York County Grand Jury investigating possible corruption among public servants who worked at the civil term of Supreme Court, New York County. On November 17, 1977 defendant reappeared and testified on his own initiative. In so testifying, defendant received "automatic" immunity by virtue of the operation of CPL 190.40, except of course with respect to the crimes of perjury and contempt. (See CPL 50.10, subd 1.) At the time of his testimony defendant had been an attorney for approximately 27 years, the last 18 of which he had spent as a law secretary with two Justices of the Supreme Court, New York County. As a result of his testimony on November 9 and 17, 1977, defendant was tried and convicted of four counts of criminal contempt in the first degree on the theory that, in four instances, he had given "equivocal, evasive, conspicuously unbelievable and patently false testimony" that amounted to no answer at all to the inquiries of the Grand Jury. (See *People v Schenkman,* 46 NY2d 232.) Briefly stated, the first count was based on defendant's testimony that he could not recollect sufficiently to admit or deny that one Brown, a law assistant whom defendant had known for 20 years, had told him that an attorney, who was a former Judge and known to defendant, would pay money for a favorable decision on a motion to be decided by

the Justice whom defendant served as a law secretary. In essence, although defendant recalled that Brown had told him that the attorney had "an interest" in the case and that one of the litigants in the case was a friend of the attorney, defendant could not recall whether the attorney's "interest" embraced bribery. The second count was based on defendant's testimony that he could not recall whether a man had come to him and told him that Brown had sent him and had told him that he should pay defendant money in connection with a case pending before the Justice with whom defendant worked. While conceding that these events "could have happened", defendant professed an inability to recall sufficiently to enable him to admit or deny whether, in fact, they had. The third count was based on defendant's inability to affirm or deny that a second attorney had come to him and told him that Brown had sent him and told him to pay money to defendant in exchange for favorable treatment. Defendant had been played a tape of a conversation in which he had told Brown that this attorney "talk[ed] too much", that defendant was not "interested in him", and that Brown should "Tell him to keep away from me." He was able to testify that, based on that conversation, the attorney "must have said something that was very offensive to me". However, defendant, in essence, could not recall whether the offensive statement was a bribe offer. The fourth count was based upon defendant's testimony that he could not recall sufficiently to admit or deny that Brown had told him that a third attorney, known to him "over a number of years", would pay money for a favorable decision on a motion that was ultimately decided by the Justice with whom defendant worked, although defendant conceded that he was aware of the litigation in question and that the attorney had been a party thereto. The events and conversations about which defendant was questioned would have occurred approximately 8 or 11 months before defendant testified, if they occurred at all. In his defense, defendant offered the testimony of character witnesses. He also offered medical testimony in an effort to show that his ability to recall during Grand Jury testimony was diminished by his high and fluctuating blood pressure condition. The physician who testified concerning the relationship between blood pressure and ability to recall testified that a mere change in blood pressure would not indicate the specific effect that that change had on a person's ability to recall and that a clinical examination would be necessary to determine the nature of that effect. Since this physician had not seen defendant before he testified, the materiality of any testimony by him concerning the effect of defendant's blood pressure upon his ability to recall was questionable. In any event, when asked a hypothetical question based solely on defendant's blood pressure readings on September 26, October 31, November 14 and November 21, 1977, he merely stated that a person whose blood pressure had changed on those dates as reflected by those readings would have suffered "some degree" of memory loss, but that he could not say "how much, how minimal, how maximum." He did not state on which dates this memory loss would have occurred or how long it would have lasted. At the outset, we reject defendant's claim that his guilt was not proved beyond a reasonable doubt. The "pivotal" inquiry to be made in this type of case is whether "the events or the details to be recalled were, on the record, significant and therefore memorable." (People v Schenkman, 46 NY2d 232, 237, supra.) In our view, it is inconceivable that defendant could not recall whether lawyers well known to him and a law assistant whom he had known for 20 years had told him 8 or 11 months earlier that money would be paid to influence the outcome of cases to be decided by the Justice whom defendant served as a law secretary. Thus, the jurys verdict convicting defendant was amply supported in this case, since "The significance of the transactions having been demonstrated, defendant's lack of recollection and evasions are, on their face, explainable only as contemptuous, that is, answers in form only, tantamount to no answers at all."

(See *People v Schenkman, supra,* p 238.) We also reject defendant's contention that the conduct of the prosecutor warrants a reversal of his conviction. In support of this contention, defendant relies in large part on a remark made by the prosecutor on summation and the prosecutor's subsequent refusal to enter into a stipulation to an uncontested fact, which stipulation defendant contended was necessary to clarify a misimpression created by the prosecutor's remark. Brown had died before defendant testified at the Grand Jury, as the People and defendant were aware prior to trial. On summation, the prosecutor stated as follows, with reference to defendant: "He had a motive to evade. He sought to protect his colleague of twenty years, Abe Brown. He sought to avoid giving testimony against [an attorney] and other lawyers who are his associates and acquaintances. He got immunity." No objection was taken to this remark at the time it was made, although defendant voiced 10 objections during the course of the prosecutor's summation. After summations, the jury was advised that it would be instructed the following day. The following day, before the jury was instructed, defendant requested that the case be reopened for a stipulation that Brown had died before defendant testified at the Grand Jury. Defendant argued, in essence, that the effect of the prosecutor's remark was to leave the erroneous impression with the jury that defendant had sought to protect Brown from prosecution. The prosecutor replied to the effect that the intended import of his remark was that defendant's motive to testify evasively was, in part, to protect the memory or reputation of Brown. The prosecutor further contended that he had not distorted the record, which contained no evidence as to whether Brown was alive or dead at the time of defendant's testimony. After the prosecutor refused to stipulate as requested, defendant's application to reopen his case to present evidence of Brown's death and the date thereof was denied by the trial court. In our view, the prosecutor's refusal to enter into the requested stipulation was improper. While the prosecutor's remark was susceptible to the interpretation advanced by him (that defendant had sought to protect the memory of the deceased Brown), we think that the primary impression created by the remark was an erroneous one (that defendant had testified evasively in order to protect Brown, a living person, from prosecution). Since this impression was concededly inaccurate and could have been corrected by a stipulation to an uncontested fact, it was incumbent upon the prosecutor, by virtue of his office, to have entered into the requested stipulation. It follows that it was error for the trial court to have denied defendant leave to reopen his case when the prosecutor declined to stipulate. (Cf. *People v Olsen,* 34 NY2d 349.) However, the prejudicial effect of the prosecutor's brief remark was not of sufficient degree to warrant reversal of defendant's conviction, in light of the overwhelming proof of defendant's guilt as outlined above. (See *People v Crimmins,* 36 NY2d 230, 237; *People v Brosnan,* 32 NY2d 254.) In this regard, we note that this is not a case where there was "such error of a trial court" or "such misconduct of a prosecutor * * * as to have operated to deny * * * defendant his fundamental right to a fair trial" *(People v Crimmins, supra,* p 238), with the result that reversal would be required regardless of the proof of defendant's guilt. (See *People v Alicea,* 37 NY2d 601; *People v Ketchum,* 35 NY2d 740.) To the contrary, the prosecutor's remark was the only flaw in an otherwise proper summation. Moreover, as already indicated, the brief remark in question was susceptible to an interpretation consonant with the truth. Perhaps, for that reason, it was not objected to by defendant's attorney, who was not reticent to object during the prosecutor's summation. Even regarding the remark in its worst light, we cannot conclude that "there is a significant probability, rather than only a rational possibility * * * that the jury would have acquitted the defendant had it not been for" the prosecutor's remark. (See *People v Crimmins, supra,* p 242.) To do so would be to ignore the ample evidence in the record that defendant had a motive to evade

which did not arise from his relationship with Brown. As the prosecutor pointed out in the sentence following the remark complained of, a motive to protect from prosecution associates and acquaintances other than Brown could be reasonably ascribed to defendant. Moreover, it went without saying that protection of defendant's own interests could have properly been ascribed to him as a motive. For example, even though defendant received immunity from criminal prosecution, admissions that he had acquiesced in the activity about which he was questioned would have been devastating to defendant's reputation and would most probably have cost him his position and his profession. Thus, the prejudicial effect of the prosecutor's remark, assessed in light of its nature and the nature of the evidence against defendant, does not require reversal of his conviction. We also reject defendant's contention that reversal is required because the prosecutor cross-examined 6 of defendant's 13 character witnesses who were Judges or attorneys concerning whether they had ever been involved in improper conduct in the professional capacities and whether they had any difficulty denying such involvement. Four witnesses were asked whether they had ever offered or been offered a bribe. Two other witnesses, attorneys, were asked whether they had ever offered a court employee a gratuity. Only three of these questions were objected to, two on the basis of "framing" or "form." All six denied having engaged in such conduct. Four were then asked whether they had any difficulty in making their denials. Defendant's objections to this question were sustained with respect to three witnesses. The fourth, an attorney and former prosecutor, testified, over objection, that he had no difficulty denying that he had ever been offered a bribe while he was a prosecutor more than 20 years earlier. Assuming that it might have been improper for the People to have pursued this line of inquiry in the first instance, they were justified in doing so, under the circumstances of this case, in response to the defendant's questioning of the People's witnesses. On the People's case, the three stenographers who had taken and transcribed defendants Grand Jury testimony testified that they had done so in accurate fashion, as a predicate for the introduction of their transcripts of that testimony. Defendant questioned each of them as to whether they had any "independent recollection" of the testimony they had transcribed, a phrase often employed by defendant in his Grand Jury testimony. Each replied that he or she did not. An Assistant District Attorney who had acted as a legal advisor to the Grand Jury was cross-examined by defendant as to whether he had any "independent recollection" of how many witnesses testified before the Grand Jury on the dates defendant had testified or during a week in which defendant had testified. He was also asked whether he had any "independent recollection" of handing defendant an exhibit or whether he could "admit or deny" that he had done so. Defense counsel admitted on summation that he had asked those questions of the Assistant District Attorney in "the same manner that [the questioner had asked questions of defendant before the Grand Jury] just to bring out a point" that the Assistant District Attorney was unable to admit or deny because he honestly could not recollect. As to his questioning of the stenographers, defense counsel stated on summation: "They were asked by me, just to show how silly this * * * particular charge is, do they have any independent recollection of the testimony that they took in the grand jury a year ago? Of course not." Thus, it was the defendant who first elicited testimony in the nature of a "memory test", by which he invited the jury to judge his ability to recall the events about which he was questioned during his testimony at the Grand Jury in light of the ability of the trial witnesses to recall other events. By so doing, he "opened the door" to the People's questioning of his own witnesses in that regard. (See *People v Singletary*, 54 AD2d 767.) We have examined defendants remaining contentions and find them to be without merit. Damiani, J. P., Mangano, O'Connor and Weinstein, JJ., concur.